IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| THE PRIME INSURANCE SYNDICATE, INC., | ] ] ] | |
| Plaintiff, | ] ] | |
| | ] | CV-05-BE-0351-E |
| v. | ] ] | |
| THOMAS CONBOY, et al., | ] ] | |
| Defendants. | ] ] | |

## MEMORANDUM OPINION

Currently pending before the court are motions for summary judgment (docs. # 65 & # 66) filed by defendants James S. Roberts; Townes, Woods, & Roberts ("TWR"); and Thomas Conboy. Following briefing by both sides, the court held a hearing on October 27, 2006. For the reasons explicitly stated on the record at the hearing and summarized below, the court GRANTS the defendants' motions for summary judgment.

Plaintiff Prime Insurance Syndicate Inc. filed a four count complaint against the defendants alleging various state tort causes of action. Counts I and II of the complaint allege tortuous interference with contract and business relations; Count III alleges abuse of process; and Count IV alleges a civil conspiracy. The court has jurisdiction of this case pursuant to its diversity jurisdiction.

I. Facts

This case arises from a wrongful death lawsuit styled *Estate of Jacob Fry v. High Note Lounge, et. al.* ("the *Frye* case") that was filed in Jefferson County Circuit Court. The plaintiffs in

1

the *Frye* case were the parents of a minor who was stabbed to death by a drunken patron of the Lounge on the evening of February 9, 2001 during a fight that started inside the Lounge. Defendants Roberts and TWR represented the plaintiffs in the *Frye* case.

Plaintiff Prime issued a liquor liability policy to the High Note Lounge and owner Karen Pilato. Karen's husband, Sam Pilato, managed the lounge. The Dram Shop liability policy contained liability limits of $100,000 that decreased with payment of attorney's fees. Prime hired attorney John Norris to defend the High Note Lounge and Sam Pilato, who was sued in his individual capacity. During the pendency of the *Frye* case, Roberts made numerous offers to settle the case for $5,000,000 or by accepting the High Note Lounge's insurance policy limits.

Defendant Conboy is a licensed psychologist and a licensed attorney. Conboy met Roberts when Conboy conducted a psychological evaluation on one of Roberts' clients. Conboy began practicing law in April 2001 and leased office space from Roberts' law firm, Townes, Woods & Roberts. Conboy's law offices were upstairs in the building occupied by TWR. Initially and during the time period at issue in this lawsuit, the lease agreement provided that Conboy's rent would be based on a percentage of income to the Conboy Law Firm.

Because he worked in the same building with Roberts, Conboy had some general knowledge about the *Frye* case. However, Conboy was not counsel of record for any party in the *Frye* case and did not affiliate or consult with Roberts or his firm concerning the litigation of the *Frye* case.

On May 20, 2004, after a four-day trial, the jury awarded the *Frye* plaintiffs a $17,000,000 verdict against the High Note Lounge. Sam Pilato was dismissed as a defendant on a directed verdict. After the verdict, Roberts offered to Norris to accept an assignment of any

claim the Pilatos might have against Prime as part of a settlement of the case.

After the verdict, Defendant Conboy had a conversation with Casey Drinkard, a mutual friend of Sam Pilato. Drinkard had previously worked part-time in Conboy's office and was a patron of the High Note Lounge. Drinkard, who no longer worked for Conboy, had actually called Conboy a few weeks before the trial of the *Frye* case and expressed her concerns about the case. Conboy advised Drinkard at that time that her friend (Pilato) should talk with his attorney about the status of the case.

When Drinkard ran into Conboy after the verdict, she expressed Pilato's concern that he might be forced to sell the lounge. Conboy briefly explained to Drinkard the potential of a bad faith claim against the insurance company. Conboy ended the conversation by inviting Drinkard to suggest that Sam Pilato give him a call, explaining that he (Conboy) could not initiate a call.

Drinkard called Pilato, who returned her call on May 27, 2004, and he recorded their conversation. She encouraged Pilato to talk with Conboy, who she said had good information about the case. When Pilato asked whether Conboy and Roberts were "in cahoots," Drinkard explained that the two attorneys worked independently but were in the same building.

Pilato called Conboy on May 28 and recorded the conversation. Conboy started the telephone conversation with Pilato by explaining to Pilato that he was not soliciting his business. Next, Conboy advised Pilato about the general nature of his dram shop liability policy, explaining the "vanishing" nature of the policy and that it could potentially put the lawyer representing the case in a conflict of interest. Next, Conboy advised Pilato of the possibility that the ABC board might try to close the business and the *Frye* plaintiffs might try to pierce the corporate veil.

At various portions of the conversation, Conboy told Pilato that he knew Roberts, that he and Roberts had a good working relationship, and that they had worked together on some cases. However, he explicitly told Conboy that he and Roberts did not share a law practice.

Toward the end of the conversation, Conboy suggested they meet in person. Pilato agreed, and he subsequently met Conboy for lunch. On the advise of Norris, Pilato tape recorded the meeting.

At the meeting, Conboy asked Pilato if he was represented by a lawyer in any action against the insurance company for bad faith. Pilato indicated that he had no independent representation for any such claim. Conboy then outlined the possibility of a conflict of interest between Norris and the Pilatos and the possibility that the *Frye* plaintiffs could attempt to pierce the corporate veil. Conboy then explained about options that Pilato might have to protect himself from personal liability, specifically mentioning assignment to the *Frye* plaintiffs of any claim that he might have against Norris or the insurance company, and generally explaining the ethical obligations that a lawyer hired by the insurance company has to his individual client.

Toward the end of the conversation, Pilato indicated that he thought the offer to settle had been $5,000,000. At that point, Conboy offered to show Pilato the Roberts' letter with the settlement offer which included a policy limits offer, and explained the ramifications of Norris' failure to advise Pilato about the settlement offer. The conversation ended when Pilato told Conboy that he would need to talk to his wife regarding further negotiations.

Conboy later met Karen Pilato from who he surmised that she did not want to sue Norris and was not going to hire Conboy. Conboy had no further contact with the Pilatos.

On October 5, 2004, approximately five months after the *Frye* verdict, the High Note

Lounge filed a bad faith lawsuit in the Circuit Court of Jefferson County, Alabama, against Prime and John Norris.  The Pilatos retained the law firm of Marsh, Rickard, and Bryan to represent the High Note Lounge in the bad faith lawsuit.  No one disputes that Karen and Sam Pilato were referred to the Marsh firm by attorney Jack Hall, Sr., or that the Pilatos were referred to Hall by the fiancee of Karen Pilato's son.

At issue in this lawsuit is the propriety of the defendants' actions after the *Frye* verdict and whether those actions precipitated the filing of the bad faith lawsuit against Prime.

## II.  Standard of Review

Summary judgment is an integral part of the Federal Rules of Civil Procedure and allows a trial court to decide cases when no genuine issues of material fact are presented and when the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56.  The parties' disagreement on each and every fact is not significant; the law requires only that "there be no genuine issue of material fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  *See also Celotex v. Catrett,* 477 U.S. 317, 327 (1986).  A factual dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 251-52.  Mere speculation is insufficient to create an issue of fact and defeat a properly-supported motion for summary judgment.  *See Ramsey v. Leath*, 706 F.2d 1166, 1169-70 (11th Cir. 1983).

## III.  DISCUSSION

The court concludes that the defendants' motions for summary judgment are due to be granted on all four counts of the plaintiff's complaint.

Regarding counts I and II alleging tortuous interference with contract or business

relations, the court finds that Prime has not created a genuine issue of material fact. Under Alabama law, to recover for tortuous interference with contract or business relations, a plaintiff must prove: (1) existence of a contract or a business relation; (2) the defendant's knowledge of the contract or business relation; (3) intentional interference by the defendant with the contract or business relations; (4) absence of justification for the defendant's interference; and (5) damage to the plaintiff as a result of the defendant's interference. *Liberty Nat'l Life Ins. Co. v. University of Alabama Health Servs. Foundation, P.C.*, 881 So. 2d 1013, 1020 (Ala. 2003).

Even assuming, for purposes of the motion for summary judgment, that the record contains sufficient evidence to create a genuine issue of material fact on the first four elements, the court nevertheless concludes that a reasonable juror could not conclude that the Defendants' alleged interference resulted in damage to Prime. In short, the court finds a lack of proximate causation between the Defendants' actions and the filing of the bad faith lawsuit against Prime in October 2004 on which Prime relies for its alleged damages. Instead, the court finds, as a matter of law, that the Pilatos' independent decision to seek legal advice from Hall, approximately three months *after* any contact with Conboy, and their subsequent decision to file suit create an intervening event sufficient to break the causal chain linked to Conboy's discussion with the Pilatos. Because the Plaintiff cannot establish the fifth element, the Defendants' motion for summary judgment is GRANTED on counts I and II of the complaint.

Similarly, the court finds that Prime has not created a genuine issue of material fact on the abuse of process claim alleged in count III of the complaint. To recover on an abuse of process claim, a plaintiff must prove: (1) malice, (2) the existence of an ulterior purpose, (3) an act in the use of process not proper in the regular prosecution of the proceedings, and (4) want of probable

cause. *C. C. & J., Inc. v. Hagood*, 711 So. 2d 947, 950 (Ala. 1998).

At the motion hearing, Prime essentially argued that Roberts and Conboy encouraged and incited High Note to file a bad faith claim with the ulterior motive of giving the *Frye* plaintiffs leverage in any post-verdict settlement proceedings. However, as the court indicated at the motion hearing, the undisputed facts of this case are that neither Defendant *filed* the bad faith lawsuit or used any process. Furthermore, when questioned at the hearing, Plaintiff's counsel indicated that he had no case law authority to substantiate his argument imputing civil liability to a third-party for legal advice that results in the filing of a lawsuit by another attorney. Consequently, the court cannot hold as a matter of law that Roberts or Conboy abused any process. The Defendants' motion for summary judgment on count III of the complaint is GRANTED.

Lastly, the court concludes that the plaintiff has not created a genuine issue of material fact on count IV of the complaint alleging a civil conspiracy because of its failure to prove the violation of an underlying tort.

The Plaintiff argues that the proposed assignment to Frye of claims the Pilatos might have against Prime to the Fryes as suggested by the Defendants would be "illegal." Plaintiff cites *Cash v. State Farm Fire & Casualty Co.*, 125 F. Supp. 2d 474, 477 (M.D. Ala. 2000), for the proposition that bad faith claims cannot be assigned. In that diversity case, the district court acknowledged that Alabama law permits the assignment of contract claims, see Ala. Code § 8-5-20, but found that bad faith *failure to pay claims* constitute torts and are not assignable. 125 F. Supp. at 477.

In so doing, the court relied on *Chavers v. National Sec. Fire & Cas. Co.*, 405 So. 2d 1, 5

(Ala. 1981), a first party bad faith case.  Such a case arises from an insurer's failure to pay the insured's claim under first party coverage, such as a homeowner's policy or health insurance.  A claim for bad faith *failure to settle* – such as the underlying claim by the Pilatos against Prime – arises from third party coverage, i.e., a liability policy.[1]  Alabama recognized liability for wrongful failure to settle in *Waters v. American Cas. Co.*, 73 So. 2d 524 (Ala. 1954).  The obligation to settle within policy limits arises from the contractual language in the policy reserving that decision for the insurer.  See *Waters*, 73 So. 2d at 531.

The Alabama Supreme Court extended and expanded the concept of bad faith liability in the situation where an insurer defends an insured under a liability policy with a reservation of rights to later deny coverage.  *L & S Roofing Supply Co. v. St. Paul Fire & Marine Ins. Co.*, 521 So. 2d 1298 (Ala. 1987).  In *L & S Roofing*, the Alabama Court adopted the concept of an enhanced obligation of good faith, imposed both on the insurance company and the attorney it hires to defend the insured in a reservation of rights situation.  *Id*. at 1302-03.

Two years after the *Cash* decision, the Alabama Supreme Court, in answering certified questions from the Eleventh Circuit, held that breach of an insurer's enhanced duty of good faith under *L & S Roofing* sounds in contract, not tort.  *Twin City Fire Ins. Co. v. Colonial Life Acc. Ins. Co.*, 839 So. 2d 614, 616 (Ala. 2002).  In reaching that conclusion, the court reasoned:

> the enhanced duty arises under the insurance contract, because no
> reservation of rights would take place without the underlying duty
> of the insurer to defend the insured, and that duty is created by
> that contract.  Because the enhanced duty arises from the contract,
> it follows that claims alleging a breach of the enhanced duty of
> good faith are contract claims.

---

[1]For a further discussion of the distinction between first party and third party claims see Bowdre, *Enhanced Obligation of Good Faith*, 50 Ala. L. Rev. 755, 764 (1999).

*Id.*

Although the Court did not address the question of assignment of such a claim, declaring breach of the enhanced duty as a contract claim seems to place it squarely within the provision of Ala. Code § 8-5-20 that allows assignment of contract claims. The reasoning of *Twin City* also applies to straight failure to settle claims because the duty to settle an appropriate case also arises from the underlying contractual duty to defend. *See Twin City*, 839 So. 2d at 616; *Waters*, 73 So. 2d at 531. Thus, the Alabama Supreme Court decision casts significant doubt on Plaintiff's argument that an assignment of the Pilatos' claim against Prime to the *Frye* Plaintiffs would have been "illegal." Further, other jurisdictions have recognized the validity and appropriateness of such assignments by insureds as a way of protecting themselves from the consequences of insurance companies who breach their obligations to the insureds. *See*, cases cited in J. Harris, *Judicial Approaches to Stipulated Judgments, Assignments of Rights, and Covenants Not to Execute in Insurance Litigation*, 47 Drake L. Rev. 853, 857-860 (1999); *Wangler v. Lerol*, 670 N.W.2d 830, 835-839 (N.D. 2003) (listing numerous cases recognizing assignment of claims against the insurer when the insured acts to protect its interest upon breach by the insurer).

Consequently, the Defendants' motion for summary judgment is GRANTED on count IV of the complaint.

DONE and ORDERED this 18th day of December 2006.

_____
KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE